2003 WY 32

**Kevin James ROBINSON, Appellant
(Defendant),**

**v.**

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 01–61.

Supreme Court of Wyoming.

March 5, 2003.

Representing Appellant: John M. Burman; Diane E. Courselle, Director, Defender Aid Program; Paul R. Flick and Lindsay A. Hoyt, Student Directors; and Amanda Wilson (Intern).

Representing Appellee: Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Sean W. Scoggin, Special Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] This is an appeal from the trial court's denial of a motion for new trial. Finding no abuse of discretion in the trial court's initial denial of the motion or in its subsequent denial of the motion after a limited remand, we affirm.

## PROCEDURAL HISTORY

[¶ 2] In 1998, the appellant, Kevin James Robinson, was convicted of voluntary manslaughter, soliciting to engage in illicit sexual relations with a minor, and taking indecent liberties with a child. Those convictions were affirmed on direct appeal to this Court in *Robinson v. State,* 11 P.3d 361 (Wyo.2000), *cert. denied,* 532 U.S. 980, 121 S.Ct. 1620, 149 L.Ed.2d 483 (2001). While that appeal was pending, the appellant filed in the trial court a Motion for New Trial Pursuant to W.R.Cr.P. 33(c). Proceedings on the motion were stayed pending the appeal. This Court's mandate affirming the appellant's convictions issued October 16, 2000. The trial court subsequently heard and denied the new trial motion. On February 9, 2001, the appellant appealed that decision.

[¶ 3] During his trial and initial appeal, the appellant was represented by attorneys from the Office of the State Public Defender. On May 15, 2001, those attorneys were allowed to withdraw because of allegations of ineffectiveness in regard to the new trial motion. The Defender Aid Program from the University of Wyoming College of Law

then entered its appearance on behalf of the appellant. Later that year, this Court granted new counsels' Motion for Limited Remand for an Evidentiary Hearing. The order granting that motion directed the trial court "to conduct a hearing and make a ruling on appellant's claim of ineffective assistance of counsel [pursuant to] *Calene v. State,* 846 P.2d 679, 692 (Wyo.1993)...." [1] The order also stayed the appeal. After the evidentiary hearing, the trial court issued a decision letter and an order denying the claim of ineffective assistance of counsel. [2]

## ISSUES

■ [¶ 4] Before listing the issues that will be discussed in this opinion, we find it appropriate to explain how those issues have arisen. Issues raised in the first appeal included sufficiency of the evidence, evidentiary rulings, ineffective assistance of counsel, prosecutorial misconduct, a photographic lineup, and alleged trial court error during *voir dire. Robinson,* 11 P.3d at 365. Those issues, all of which concerned the jury trial, are settled and gone. The present appeal is taken from the trial court's denial of the appellant's new trial motion, which motion raised only the issue of newly discovered evidence. In developing that issue, however, appellate counsel obtained the remand to the trial court for an evidentiary hearing to determine whether prior counsel was ineffective in regard to that motion and hearing. During the evidentiary hearing, and in later briefing, the appellant raised as a particular question whether prior counsel was ineffective for having failed to raise a *"Brady* issue." [3]

[¶ 5] Perhaps due to this somewhat complex procedural history, the parties do not exactly agree as to what issues are before this Court. Surprisingly, inasmuch as this appeal is actually from the trial court's denial

---

1. In *Calene,* we provided for such a hearing on remand in cases where "contentions of ineffectiveness are first developed by appellate counsel during record examination and appellate briefing preparation...." *Calene v. State,* 846 P.2d 679, 692 (Wyo.1993).

2. No notice of appeal directed to those rulings has been filed. *Terry v. State,* 2002 WY 162, ¶ 15,

56 P.3d 636, 641 (2002), suggests that a second notice of appeal is unnecessary under these circumstances.

3. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires the State to disclose to a defendant any exculpatory evidence of which it becomes aware.

of the new trial motion, the appellant does not specifically list that as an issue. Instead, the appellant lists two issues: (1) the alleged ineffective assistance of counsel in regard to the new trial motion; and (2) whether the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The State lists all three issues, and adds in its briefing that the *Brady* issue, not having been raised in the new trial motion, should not be heard.

[¶ 6]   From the arguments made during the hearing on the motion for a new trial, from the arguments made during the evidentiary hearing on remand, and from the briefs, we discern the following issues that require resolution:

1.   Whether the trial court abused its discretion in concluding that the appellant received effective assistance of counsel in regard to the motion for a new trial?

2.   Whether the trial court abused its discretion in denying the motion for a new trial?

### FACTS

[¶ 7]   Part of the appellant's trial strategy was to suggest that there were other people with a possible motive to kill the victim. One of those "suspects" was Xavier Lopez, who had been convicted for having a sexual relationship with the victim. *Robinson*, 11 P.3d at 374. The district court limited the appellant's attempt to delve into the sexual relationship between Lopez and the victim because the appellant could not show contact between the two in the year before the victim's death. During the trial, however, defense counsel was sufficiently successful in advancing Lopez as a suspect that, during deliberations, the jury sent out a note inquiring about him.[4]

[¶ 8]   During its investigation of the homicide, the State had learned of a man named David Bartlett, who allegedly had told a woman named Shelly Strauser that Lopez, not the appellant, had killed the victim. When a sheriff's investigator interviewed

Bartlett, Bartlett admitted that he had made the statement implicating Lopez, but claimed that he had been lying and was just trying to "sound like a big guy." The sheriff's investigator made no notes or other record of the interview. Bartlett was, however, included on the State's "interview list," so he was interviewed by the defense investigator. In that interview, Bartlett flatly denied having made any statements about Lopez. Not knowing of Bartlett's contrary assertion to the sheriff's investigator, the defense investigator did not confront Bartlett with the inconsistency. This situation is the basis for the appellant's present *Brady* argument.[5]

[¶ 9]   After the trial, Bartlett and Lopez came back to the attention of defense counsel and became the basis for the new trial motion. On March 19, 1999, a private attorney who had once represented the appellant took sworn statements from Aaltje Lessard and her mother, Kristine Unger–Lessard. The relevant gist of those statements was that sometime in the late summer of 1998, while Bartlett was dating Lessard, Bartlett told Lessard that Lopez, not the appellant, had killed the victim and that he, Bartlett, had helped Lopez dispose of the body. Unger–Lessard stated that Bartlett had later repeated that information to her in telephone conversations. The appellant now presents these statements as the newly discovered evidence justifying a new trial.

### STANDARD OF REVIEW

INEFFECTIVE ASSISTANCE OF COUNSEL

[¶ 10]   In the first appeal of this case, we reiterated our standard for the review of claims of ineffective assistance of counsel:

A claim of ineffective assistance of counsel is reviewed under the well known standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made

---

4.   The note read: "Can you tell us what testimony concerning Xavier Lopez and members of his family was admitted into evidence?"

5.   As will be explained later herein, this contention has undergone a metamorphosis during the process of the appeal.

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

We invoke a strong presumption that counsel rendered adequate and reasonable assistance making all decisions within the bounds of reasonable professional judgment. *Jackson v. State,* 902 P.2d 1292, 1295 (Wyo.1995).

*Robinson,* 11 P.3d at 367–68 (*quoting Mapp v. State,* 953 P.2d 140, 143 (Wyo.1998)).

[¶ 11] We have identified and applied this standard many times. *See, for example, Becker v. State,* 2002 WY 126, ¶ 12, 53 P.3d 94, 98 (2002); *Weidt v. State,* 2002 WY 74, ¶ 22, 46 P.3d 846, 855 (2002); and *Lancaster v. State,* 2002 WY 45, ¶¶ 56–57, 43 P.3d 80, 101–02 (2002). In doing so, however, we have not clearly explained how the test is applied by this Court after it has already been applied in the trial court. There are three scenarios: (1) the issue was raised, heard, and decided in the trial court before the appeal was filed; (2) the issue was first raised as part of the appeal and was decided by this Court on the record presented; and (3) the issue was first raised as part of the appeal, there was a remand to the trial court for a *Calene* hearing and a decision by the trial court, and that decision was then addressed on appeal. The third situation exists in the present case.

[¶ 12] In *Calene v. State,* 846 P.2d 679, 692–93 (Wyo.1993), Justice Urbigkit described these varying situations and the need for a remand to the trial court when the ineffectiveness claim requires development of the record. The purpose of the remand is not solely to adduce evidence; rather, the trial court "will provide a specific decision addressing separate contentions by examina-

tion and resolution of the validity of any trial court ineffectiveness of counsel contentions." *Id.* at 692. *Calene* does not go on, however, to explain the nature of this Court's review of the trial court's decision.

[¶ 13] A somewhat similar situation occurred in *McCoy v. State,* 886 P.2d 252, 254 (Wyo.1994), except that the hearing in the trial court occurred before the appeal instead of on remand. After reaffirming application of the *Strickland* test, this Court stated simply that "[w]e agree with the trial court's conclusion[.]" *McCoy,* 886 P.2d at 257. We did not explain what process we had followed in reaching that conclusion.

[¶ 14] The issue of ineffective assistance of counsel presents a mixed question of fact and law. *Calene,* 846 P.2d at 692; *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It has been said that the review of such a mixed question is *de novo,* but the factual findings of the trial court are accepted unless they are clearly erroneous. *United States v. Prows,* 118 F.3d 686, 691 (10th Cir.1997); *Brewer v. Reynolds,* 51 F.3d 1519, 1523 (10th Cir.1995), *cert. denied,* 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996).

The definitive test of when a finding of fact is clearly erroneous is when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. A determination that a finding is against the great weight of the evidence means that a finding will be set aside even if supported by substantial evidence.

*Hutchings v. Krachun,* 2002 WY 98, ¶ 10, 49 P.3d 176, 180 (2002). The *de novo* review specifically addresses whether counsel's performance was legally deficient and whether prejudice resulted. *United States v. Haddock,* 12 F.3d 950, 955 (10th Cir.1993).

[¶ 15] This standard of review is very similar to the standard of review of the denial of a motion to suppress. Although we have described that standard as being "abuse of discretion," it goes beyond a determination that the trial court exercised reasonableness or sound judgment. Because the trial court

heard and weighed the evidence, assessed witness credibility, and made the necessary inferences and deductions from the evidence, the trial court's factual findings are not disturbed on appeal unless they are clearly erroneous, and the evidence is viewed in the light most favorable to the trial court's determination.[6] *Meek v. State*, 2002 WY 1, ¶ 13, 37 P.3d 1279, 1283 (2002). What is reviewed *de novo* in the case of a motion to suppress is the constitutionality of the questioned search or confession. *Martindale v. State*, 2001 WY 52, ¶ 9, 24 P.3d 1138, 1140–41 (2001) (*quoting Putnam v. State*, 995 P.2d 632, 635 (Wyo. 2000)); *State v. Evans*, 944 P.2d 1120, 1124 (Wyo.1997).

[¶ 16] This same test is appropriate for appellate review of a trial court's determination that ineffective assistance of counsel did not occur. Where the trial court has heard and decided the issue, we will not disturb that court's findings of fact unless they are clearly erroneous or against the great weight of the evidence. We will, on the other hand, conduct a *de novo* review of the trial court's conclusions of law, which include the question of whether counsel's conduct was deficient and the question of whether the appellant was prejudiced by that deficient conduct. Furthermore, there is no reason that the same standard should not apply both to a pre-appeal hearing and a hearing upon remand.

[¶ 17] In the instant case, the issue of ineffective assistance of counsel in regard to the new trial motion was heard and decided against the appellant by the trial court. We review that determination for an abuse of discretion, as that standard has been described herein.

### DENIAL OF THE MOTION FOR A NEW TRIAL

[¶ 18] The question of whether to grant or deny a new trial motion is a matter for the discretion of the trial court, and the trial court's decision will not be reversed without a showing of abuse of that discretion. *Baumgartner v. State*, 7 P.3d 912, 915 (Wyo. 2000). A trial court abuses its discretion when it could not have reasonably concluded

as it did. *Id.* In this context, "reasonably" means " 'sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' " *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998) (*quoting Martin v. State*, 720 P.2d 894, 897 (Wyo.1986)).

[¶ 19] The appellant's new trial motion was filed pursuant to W.R.Cr.P. 33(c), which reads as follows:

A motion for a new trial based on the grounds of newly discovered evidence may be made only before or within two years after final judgment but if an appeal is pending, the court may grant the motion only on remand of the case. A motion for new trial based on the ground of newly discovered evidence shall be heard and determined and a dispositive order entered within 30 days after the motion is filed unless, within that time, the determination is continued by order of the court, but no continuances shall extend the time to a day more than 60 days from the date that the original motion was filed. When disposition of a motion for new trial based on newly discovered evidence is made without hearing, the order shall include a statement of the reason for determination without hearing.

[¶ 20] Clearly, this subsection provides only the procedural mechanism for such a motion. The substantive provision is contained in W.R.Cr.P. 33(a), which provides, in pertinent part, that the trial court "may grant a new trial to that defendant if required in the interest of justice." We have adopted the following standard for the granting of a new trial based on newly discovered evidence:

In order to obtain a new trial on the basis of newly discovered evidence, a defendant must establish each of the following factors: 1) he did not become aware of the new evidence until after the trial; 2) it was not because of lack of due diligence that the new evidence did not come to light sooner; 3) the evidence is so material that

6. When the trial court has not made specific findings of fact, its general ruling is upheld if it is supportable by any reasonable view of the evidence. *Buckles v. State*, 998 P.2d 927, 930 (Wyo. 2000) (*quoting Frederick v. State*, 981 P.2d 494, 497 (Wyo.1999)).

it would probably produce a different result; and 4) the evidence is not cumulative.... If a defendant fails to prove any of these factors, the motion is properly denied.

*Baumgartner,* 7 P.3d at 915.

## DISCUSSION

### INEFFECTIVE ASSISTANCE OF COUNSEL

[¶ 21] During the evidentiary hearing on remand to the trial court, the appellant raised three allegations of ineffective assistance of counsel in regard to the new trial motion: (1) inadequate investigation; (2) failure to object to a *Brady* violation; and (3) failure to request production of a certain taped interview and to request a continuance of the hearing. The first allegation focused on counsel's failure to discover and develop evidence to corroborate the statements of Lessard and Unger–Lessard about Bartlett's implication of Lopez. The second allegation concerned counsel's failure to object to the State's failure to disclose the results of an investigative interview with Bartlett. The third allegation was based on counsel's failure to seek a copy of a taped interview between Bartlett and a detective that occurred two days before the hearing and to move for a continuance of the hearing based on that new interview.

### *Inadequate Investigation*

[¶ 22] Lessard and Unger–Lessard gave their sworn statements in March 1999. Lessard died in a car accident in the summer of 2000. Consequently, Unger–Lessard was available to testify at the January 17, 2001, hearing on the new trial motion, but Lessard's testimony was available only through a transcript of her statement. Defense counsel had been unable to locate Bartlett, so he, too, was unavailable. In a decision letter denying the new trial motion, the trial court first identified the resulting "hearsay within hearsay" problem, and then provided the following detailed analysis of the matter:

7. A footnote at this point in the text of the decision letter reads as follows:

The Court assumes for purposes of this motion that Mr. Bartlett is unavailable within the meaning of Rule 804(a) as has been asserted by

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. Rule 801(c) (Lexis 2000). Obviously, the statements allegedly made by Mr. Bartlett to Ms. Lessard are hearsay. Further, because Ms. Lessard is deceased, Defendant seeks to introduce such statements either through Ms. Lessard's sworn statement as evidenced in the transcript attached to his *Motion,* or through her statements to her mother. Thus, the statements are "hearsay within hearsay,["] and, under W.R.E. 805, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." W.R.E. 805 (Lexis 2000). Thus, both levels of hearsay must meet an exception to the hearsay rule before the statement will be admissible. *Robinson,* 11 P.3d at 371.

Here, the first level of hearsay (i.e. certain statements Mr. Bartlett allegedly made to Ms. Lessard) may fall within the W.R.E. 804(b)(3) exception as "statements against interest." [7] For the sake of argument, the Court assumes this first hearsay hurdle is overcome, leaving the second layer of hearsay (i.e. the sworn statement or the statements made to Ms. Unger–Lessard). Therein lies the problem. The second hearsay layer does not meet with any of the exceptions set out at Rules 803 or 804 of the Rules of Evidence. The "sworn statement" cannot qualify as "former testimony" under W.R.E. Rule 804(b)(1) because the State had no opportunity to develop the testimony by direct, cross, or redirect examination. Indeed, the record contains no indication that the State was made aware of the sworn statement before it was taken. Further, the statements do not qualify as: 1) statements under belief of impending death (W.R.E.804(b)(2)); 2)

Defendant. In fact, evidence presented at hearing indicates that Mr. Bartlett is well known to local law enforcement officers and that he is alive and well and living in Cheyenne.

statements against interest by Ms. Lessard (W.R.E.804(b)(3)); 3) statements of personal or family history (W.R.E. 804(b)(4)); or 4) statements of recent perception (W.R.E.804(b)(5)). Neither do any of the statements made by Ms. Lessard qualify as present sense impressions, excited utterances, statements of then-existing mental or physical conditions, or any of the other declarations that may be exempted under the rules. At most, they are statements made to her by Mr. Bartlett and later relayed to her mother concerning events that happened months prior.

[¶ 23] Finally, the district court considered the admissibility of Lessard's statements under the "catchall" exception found in W.R.E. 804(b)(6).[8] In concluding that the statements were inadmissible because they "are not sufficiently reliable and trustworthy as to overcome the second hearsay hurdle," the trial court noted the lack of independent facts supporting the statements and detailed the "flaws" in Bartlett's purported version of the murder:

1. Mr. Bartlett, who allegedly made these statements, apparently now claims that he does not know the Lessards and that he never made such statements.

2. Ms. Lessard reported that Mr. Bartlett told her that he observed Mr. Lopez standing over [the victim's] body with a knife in one hand and "the baby" in the other. In fact, given the extremely early stage of [the victim's] pregnancy, this scenario is impossible. Additionally, autopsy reports showed no abdominal stabs suffered by [the victim.]

3. Allegedly, Mr. Bartlett stated that he, Mr. Lopez, and [the victim] were "doing drugs" in Mr. Lopez's trailer, where the murder occurred. In contrast, Mr. Lopez testified that he had not seen [the victim] at any time near her death and that he could establish his presence at work or at home during said time period. Law enforcement officers confirm this. Second, no testimony at trial indicated the presence of illegal drugs in [the victim's] body. Further, Mr. Lopez believes he may have met Mr. Bartlett in prison, but he cannot even state with certainty whether he, in fact, ever met Mr. Bartlett. Finally, Mr. Lopez did not live in a trailer at the time surrounding [the victim's] death, and it does not appear that he ever lived in a trailer. He lived in a house with his parents.

4. Mr. Bartlett did not, according to Ms. Lessard, describe the victim's clothing or state of dress; he did not indicate what happened to the murder weapon or describe it in any detail; he did not indicate where [the victim's] clothes were disposed of; and he did not indicate how or when the murder scene . . . was cleaned.

5. Most statements made by Mr. Bartlett for which there is any degree of corroboration (such as the general location of [the victim's] body) were matters of public knowledge as a result of widespread publicity surrounding [the victim's] murder and Defendant's trial. Any specific, substantive statements made by him appear completely incredible and are contradicted by the evidence admitted at trial.

[¶ 24] In its decision letter, the trial court next went through a similar but somewhat

8. W.R.E. 804(b) reads, in pertinent part:
  *Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable *as a witness:*
  ✳ ✳ ✳
  (6) Other Exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

more abbreviated analysis of the testimony of Unger–Lessard. In evaluating that testimony, the trial court assumed that Bartlett's claimed statements to her would be admissible as statements against interest under W.R.E. 804(b)(3).[9] However, he discounted the weight and importance of Unger–Lessard's testimony because it was not substantiated by other trial testimony and because it "differ[ed] dramatically" from what she said in her sworn statement. In addition, the trial court scored defense counsel for presenting no corroborative evidence:

> Additionally, Defendant presented no corroborating evidence that could have boosted the credibility and reliability of Ms. Unger–Lessard's statements. Defendant might have produced or indicated why it could not produce: 1) telephone records detailing the calls made to Ms. Unger–Lessard's home by Mr. Bartlett; 2) telephone records from the Albany County Detention Center demonstrating Mr. Bartlett's alleged call to Ms. Unger–Lessard from jail; 3) a recording of Mr. Bartlett's from-jail conversation with Ms. Unger–Lessard, as recorded per Albany County Detention Center custom and norm; and/or 4) records from the Albany County Detention Center demonstrating the time period(s) during which Mr. Bartlett was a jail resident. Not only were none of these records produced, if indeed they were available, it appears there was no attempt even to determine whether such records existed. Finally, as noted above, it appears that Mr. Bartlett is, in fact, available, although he denies knowledge of the Lessards or the incident as a whole. Still, Defendant failed to produce this key individual to testify at the motion hearing.

[¶ 25] These identified deficiencies now form the basis for the appellant's claim of inadequate investigation by counsel. At the evidentiary hearing, the appellant's new counsel took the position that, had prior counsel performed a better investigation and made better legal arguments, the trial court would have granted a new trial. Specifically, counsel contended that the corroborative evidence produced during the evidentiary hearing should have been discovered and presented by defense counsel at the initial hearing. Without going into detail, suffice it to say that this evidence was intended to bolster Unger–Lessard's credibility by establishing how well she knew Bartlett, to bolster Bartlett's credibility by showing the inherent trustworthiness of his statements, and to support the admissibility of Lessard's statements under the "catchall" exception to the hearsay rule.

[¶ 26] In its second decision letter, this one issued after the evidentiary hearing, the trial court correctly pointed out that, although it had earlier been critical of defense counsel for not providing more evidence to corroborate the Lessard–Bartlett stories, counsel's efforts had to be evaluated in light of all the circumstances and without the benefit of hindsight. *See Jackson v. State,* 902 P.2d 1292, 1295 (Wyo.1995) and *Gist v. State,* 737 P.2d 336, 342 (Wyo.1987). The trial court then observed that this was not a situation where defense counsel had failed to interview eyewitnesses or had failed to secure their testimony for trial. *Compare King v. State,* 810 P.2d 119, 123 (Wyo.1991). Instead, the trial court pointed out the extensive investigation counsel *had* performed in preparing for the hearing on the new trial motion, including attempts to locate Bartlett, requests for Unger–Lessard's phone records, a "thorough and exhaustive" review of the court file, conversations with prior defense counsel, and interviews with members of the county attorney's staff. The trial court then concluded that counsel's overall performance had not violated the objective standard of

---

9. W.R.E. 804(b) reads, in pertinent part:

*Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(3) Statement Against Interest.—A statement which was at the time of the making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement[.]

reasonableness and that it had not caused a failure of the adversarial process in the appellant's case.

[¶ 27] Additionally, the trial court concluded that, even if counsel's performance had been so deficient as to meet the first half of the *Strickland* test, there was no prejudice to the appellant. The trial court acknowledged that testimony during the evidentiary hearing had bolstered the credibility of the Lessards, and that it tended to prove the Lessards knew Bartlett and Bartlett "likely made such statements" to them. The trial court reiterated, however, that the difficulty was not so much the Lessards' credibility as it was Bartlett's credibility. Finally, the trial court concluded that the appellant was not prejudiced by the alleged failure of defense counsel to conduct a better investigation because, even with that "deficiency" remedied during the evidentiary hearing, the Bartlett evidence was not sufficiently credible to justify a new trial.[10]

■ [¶ 28] Our review of the record in this case, particularly the transcripts of the two hearings and the two decision letters, convinces us that the trial court did not abuse its discretion in concluding that the appellant has not shown ineffective assistance of counsel in regard to the issue of the adequacy of the investigation. The trial court's findings of fact are not clearly erroneous or contrary to the great weight of the evidence, and the trial court correctly applied the law to those facts.

### *The* Brady *Violation*

[¶ 29] A sheriff's investigator testified at the new trial motion hearing that, prior to trial, he had interviewed Bartlett about the statements Bartlett allegedly made to the Lessards and that, while Bartlett admitted making those statements, he said that he had been lying. In his Motion for Limited Remand for an Evidentiary Hearing, the appellant contended that this testimony came as a surprise to counsel because the State had not previously disclosed it. The appellant then contended that counsel was ineffective at the motion hearing because she did not object to this apparent violation of *Brady*.

[¶ 30] This argument took a sudden turn, however, during the later evidentiary hearing when the same investigator testified that his earlier testimony had been mistaken. His pretrial interview with Bartlett involved statements Bartlett allegedly made to Strauser, not to the Lessards. Prior to the trial, he had not even been aware of the Lessards. This development caused defense counsel to "switch horses in mid-stream." Instead of continuing to argue that the *Brady* violation consisted of the State's failure to identify the Lessards as exculpatory witnesses, the appellant began to contend that *Brady* was violated when the State did not disclose to defense counsel that Bartlett admitted having made statements to Strauser implicating Lopez in the murder. This transformation cannot be characterized as a seamless web. At one point, counsel even agreed temporarily with the trial court that there was no *Brady* violation before he latched onto the new theory:

THE COURT: And I guess this goes to the *Brady* issue, which I have some concerns about—or some questions about.

As I understand it, it was the State's—or the defense's contention that there had been an interview with Mr. Bartlett in that May time frame, May '98 time frame, while he was in jail, concerning statements made by the Lessards—or to the Lessards; that those had never been disclosed by [the investigator] to the defense, and that's the essence of the *Brady* allegation here; is that correct?

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: Now, that, frankly, made no sense at all. Because I agree with you, he cannot have discussed the Lessards' issue with Mr. Bartlett in May of 1998 because he didn't know the Lessards and

---

10. Throughout both hearings and both decision letters, the trial court pointed out numerous features of Bartlett's alleged statements that simply were not credible. The most obviously false and glaringly incredible claim was that Bartlett had seen Lopez standing over the victim's body, a bloody knife in one hand and "the baby" in the other. The trial court also noted that the only details of Bartlett's statements that could be corroborated were those bearing on matters that were known to the public.

that issue just didn't exist, so that's just not possible.

Are we in agreement on that?

[DEFENSE COUNSEL]: Yes, Your Honor, we are.

THE COURT: So do we agree, then, that there was nothing here—how can we have a *Brady* violation for not disclosing that which was not known and could not exist?

[DEFENSE COUNSEL]: Well, at trial, Your Honor, it was an apparent *Brady* violation. At that—I mean, at the hearing. I'm sorry. The hearing.

THE COURT: Right, I understand that.

[DEFENSE COUNSEL]: That she was ineffective for, at that point, not objecting to the fact—what she said today, she thought it was a *Brady* violation, and she did not object to it.

THE COURT: Where is the prejudice? As it turns out, there wasn't.

[DEFENSE COUNSEL]: Well, the prejudice is the fact that had she been able to object to that and been able to review what was actually—what actually happened, she would have been able to more effectively cross-examine [the investigator] about what he really did. She would have found out that he didn't interview Mr. Bartlett about the Lessards, as he represented. And that may have changed the outcome of this trial. We don't know.

THE COURT: You're not saying now there was, in fact, a *Brady* violation?

[DEFENSE COUNSEL]: Excuse me?

THE COURT: You're not saying now there was, in fact, a *Brady* violation?

[DEFENSE COUNSEL]: No, we are not saying now, not after [the investigator's] testimony today, we are not.

THE COURT: So the alleged—the ineffectiveness comes from not asking for time to investigate in order to determine that, in fact, there wasn't any violation?

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: So where is the prejudice? I just don't understand. If she had asked for time—I could see your point if

there was, in fact, a violation, and she had not asked for time to investigate that, and it later turned out, yes, there was a violation. I could see that. What's the prejudice? If, in fact, and as we agree, there is no violation, there was no *Brady* problem.

[DEFENSE COUNSEL]: I guess the prejudice, Your Honor, is that the outcome of that hearing could have been different.

THE COURT: Why? Why would it have been different? If she had asked for time, she would have received time. She would have investigated. She would have found there was no violation. How could it possibly be any different except it takes longer to get to the same end result?

[DEFENSE COUNSEL]: Well, Your Honor, I see your point. I see your point. But I can only go back to it could have been different. Well, there may have been a violation because the record isn't clear that [the investigator] told defense counsel about the interview he did conduct. The evidence isn't clear if he ever told defense counsel about [Strauser's son].

THE COURT: That's not the basis for your motion for new trial. Your basis for your motion for new trial involved the Lessards. That's not an issue.

[DEFENSE COUNSEL]: But it still would have been a *Brady* violation had he not told, had—He still would have—he might have been able to—there would have been—still been a *Brady* violation as to the fact that he never turned over any information about Shelly Strauser. . . .

In fact, as we saw today, as we had the interview list—I didn't present him with the interview list because he said that Shelly Strauser was not on his interview list, and yet at the time of the motion hearing, even if it was Shelly Strauser, there still could have been a *Brady* violation because that information about Shelly Strauser was never turned over to defense counsel before trial; so therein lies a separate *Brady* violation, although not for the Lessards but for the Strauser—the Strauser interview, that that information was not turned over.

THE COURT: Of course, the defense knew about that because you had interviews with her yourself, right, as evidenced—

[DEFENSE COUNSEL]: Your Honor, I never interviewed Ms. Strauser.

THE COURT: "You" I mean the defense generally. But State's Exhibit 1 shows interviews with Ms. Strauser, shows that the defense was aware of allegations by Mr. Bartlett against Mr. Lopez, shows all these kinds . . .

So again, where is the prejudice? Assuming what you say is true, what's the prejudice?

[¶ 31] The trial court's conclusion in its second decision letter that there was no ineffective assistance of counsel in regard to the alleged *Brady* violation followed a similar analysis:

Defendant next argues that [defense counsel] should have objected to an apparent *Brady* violation when [the investigator] testified at the hearing on *Defendant's Motion for New Trial Pursuant to W.R.Cr.P. 33(c)*. [The investigator] testified that his pre-trial interview with Bartlett originated from his knowledge of **statements Bartlett made to the Lessards.** At first blush, it appeared [the investigator] had knowledge of the exculpatory material provided by the Lessards and failed to so disclose to defense counsel, hence a *Brady* violation.

However, as [the investigator] clarified at the present hearing, he was mistaken in his testimony. He did, indeed, conduct a pre-trial interview with Bartlett but it was as a result of his communications with **Strauser,** not the Lessards. The former scenario would have been impossible, as the only pretrial interview of Bartlett conducted by [the investigator] took place at the ACDC, and the only time Bartlett was incarcerated prior to the trial was in the late Spring of 1998, prior to the time he met Lessards. Indeed, the evidence now indicates the defense was aware of Mr. Bartlett's statement to the Lessards long before the State. As a result, there was no *Brady* violation.

And, in any event, this Court does not believe that [defense counsel's] failure to object to an apparent, but ultimately non-existent, *Brady* violation arising at a motion hearing several years after Defendant's trial rises to the deficiency standard required by *Strickland.* Again evaluating [defense counsel's] overall performance, the Court notes that [she] attempted to address the apparent *Brady* violation through her examination of [the investigator]. Certainly [she] was surprised to learn that the State had pretrial knowledge of the Lessards and Bartlett's statements to them, but she effectively addressed it through examination. This conduct does not rise to the level of deficiency discussed in *King, supra* or *Gist, supra.* [Defense counsel's] failure to object was not so ineffective as to be declared objectively unreasonable. Defendant fails to pass this prong of the test.

* * *

Yet, even if [defense counsel's] conduct been so deficient, this Court is want to find prejudice to Defendant. Defendant argues [defense counsel] should have objected to this apparent violation and request[ed], in the very least, a continuance. A continuance would, at best, have allowed her to investigate [the investigator's] hearing testimony and ascertain, as was ultimately discovered, that he was mistaken and that there was no *Brady* violation. Perhaps this would have been more efficient but the end-result would have been identical. Given no *Brady* violation, this Court cannot believe that the results of Defendant's hearing on a motion for a new trial would have differed. The Court is at a loss to find any prejudice to the Defendant whatsoever.

(Emphasis in original and footnotes omitted.)

■■■ [¶ 32] We find that the trial court did not abuse its discretion in its analysis and conclusions regarding this issue. Its factual findings are not contrary to the great weight of the evidence. Indeed, those findings are not really contested. Furthermore, we cannot fault the trial court's conclusion that failure to pursue the particular *Brady* violation alleged—that the State knew of the Lessards before trial but failed to inform the appellant

of that knowledge—created no prejudice because there was no such violation.[11] We agree with the trial court that neither prong of the *Strickland* test has been met.

### The Taped Interview

[¶ 33] In her opening statement during the hearing on the new trial motion, defense counsel detailed her efforts to locate Bartlett and asked the trial court to consider him to be an unavailable witness under the rules of evidence governing hearsay. She then presented her evidence and argument based on Bartlett's unavailability. In later ruling on the motion for new trial, the trial court assumed Bartlett was unavailable, despite proof to the contrary.

[¶ 34] The State called two witnesses at the motion hearing, the second being a police detective who had interviewed Bartlett two days before the hearings. The detective testified that during the interview, which was tape-recorded, Bartlett had admitted knowing Lopez "from jail," but denied ever having met the victim, and denied that he knew anything about the murder. During cross-examination, the detective noted that Bartlett also denied knowing the Lessards and denied having made any statements to them. The appellant argued at the later evidentiary hearing, and continues to argue in this appeal, that prior counsel was ineffective because she did not ask for a recess or a continuance of the motion hearing, nor did she object or even ask to hear the tape, when she learned of the detective's interview with Bartlett.

[¶ 35] The trial court concluded that counsel had not been ineffective, under the objective standards of the *Strickland* test, in her handling of the latest Bartlett interview. The trial court noted first that the interview was not exculpatory as to the appellant, that Bartlett had provided "very little beneficial information" for counsel's use, and that a

continuance would not have been warranted. Further, the trial court found that no prejudice had resulted from counsel's decision merely to cross-examine the detective rather than seek a continuance, because the tape of the interview was available to the trial court, and the little corroboration it contained bolstered only Unger–Lessard's credibility, not Bartlett's.

[¶ 36] We cannot say that the trial court abused its discretion in the way it analyzed this issue or in concluding as it did. Prior to the trial, the defense investigator interviewed Strauser, Bartlett, and Lopez. After the trial, the defense team learned of and interviewed the Lessards before the State did. By the time of the hearing on the new trial motion, the defense was well aware that Bartlett had both made and denied making incriminating statements about Lopez. The fact that defense counsel did not request a continuance for an additional investigation because Bartlett contradicted himself yet again a few days before the hearing simply does not rise to the level of deficient performance required to prove ineffective assistance of counsel, nor has prejudice been shown.[12]

### DENIAL OF THE MOTION FOR A NEW TRIAL

[¶ 37] As we noted earlier herein, a person seeking a new trial on the basis of newly discovered evidence must show:

(1) he did not become aware of the new evidence until after the trial; (2) it was not because of lack of due diligence that the new evidence did not come to light sooner; (3) the evidence is so material that it would probably produce a different result; and (4) the evidence is not cumulative.

*Baumgartner,* 7 P.3d at 915. We review the trial court's denial of a new trial motion for an abuse of discretion. *Id.*

---

11. We will later herein consider the separate but related issue of whether a new trial should have been granted after the second hearing upon the appellant's new argument that the *Brady* violation was actually the State's failure to disclose to the appellant the results of the interview of Bartlett arising from the Strauser information.

12. In his brief, the appellant repeatedly characterizes the State's failure to disclose this interview as violative of a reciprocal discovery order. We decline to address that issue, however, because the appellant did not present a separate argument in that regard, with citations to pertinent authority.

[¶ 38] In both decision letters—the one following the original motion hearing and the one following the evidentiary hearing after remand—the trial court applied the four-factor test in denying the motion. It is not necessary here to repeat the details of the Bartlett/Lessard evidence. Suffice it to say that the trial court concluded in its first decision letter that Bartlett's alleged statements to Lessard were inadmissible hearsay and thus could not serve as the basis for granting a new trial. As to Bartlett's alleged statements to Unger–Lessard, the trial court found them to be "unbelievable, unsupported, and inadmissible," and therefore not so material as to probably produce a different verdict. Further, the trial court concluded that, because the appellant before trial knew of Lopez and knew that Bartlett may have made statements about Lopez, appellant "at least had the means and reasons to pursue" this evidence and it was not, therefore, newly discovered.

[¶ 39] During the subsequent evidentiary hearing, the confusion over the Strauser and Lessard interviews was cleared up. In addition, the appellant presented more evidence intended to corroborate the Lessards' testimony. Nevertheless, the trial court once again denied the new trial motion:

First, it is crucial to note that Bartlett's narrative of [the victim's] death and his role therein remains incredible. No corroborating evidence presented by [prior defense counsel] or Defendant's current counsel bolstered Bartlett's credibility. Newly discovered evidence upon which a motion for a new trial is requested must be evidence that is material, competent, and relevant to the issues. 58 Am.Jur.2d, New Trial § 431, at 407. Even without the hearsay and "hearsay within hearsay" difficulties discussed in the January 26, 2001, DECISION LETTER, this Court is required to evaluate the credibility of the evidence. The simple truth is that much of Bartlett's alleged commentary to the Lessards is plainly contradicted by trial evidence and verified facts and by his own inconsistencies. It is wholly proper to deny a new trial where the testimony, or "newly discovered evidence" is conflicting and there is ample evidence in the record to sustain the verdict. Indeed, a new trial will not be granted where a "confession" is found unworthy of belief. That certainly was and is the case here. Even [prior defense counsel's] failure to present certain corroborating evidence or to make certain objections does not alter that conclusion; Defendant was in no way prejudiced by her representation as counsel.

Second, it remains true that the general information regarding Bartlett's accusations of Lopez's involvement in [the victim's] murder is not newly discovered since the trial. Indeed, while it appeared at the initial hearing on the Motion for New Trial that the defense had become aware of Bartlett only after it received the depositions from [Mary Elizabeth] Galvan, it is now clear that the defense was aware of and actually interviewed Bartlett regarding Lopez prior to trial. Defense counsel apparently determined the information incredible or not supported and discontinued any investigation into the matter after interviews of Bartlett, Lopez, and others. True, knowledge of the Lessards came post-trial, but the general information contributed by the Lessards was not new. To the extent the evidence was not "new" to the Defendant, this Court had no alternative but to deny him a new trial. To the extent the Lessards provided evidence that would corroborate Strauser's report and/or bolster Bartlett's credibility, this Court thoroughly addressed the flaws in Defendant's position in its former decision and need not further consider the issue.

(Footnote omitted.)

[¶ 40] We cannot improve upon the trial court's analysis of the Bartlett/Lessard evidence except to conclude that the evidence also fails to meet the fourth requirement of the four-part test; that is, it is cumulative. Evidence is cumulative if it speaks to a fact in relation to which there was evidence at trial. Kavanaugh v. State, 769 P.2d 908, 913 (Wyo.1989). Evidence is not cumulative if it is of a different character and of a separate and distinct fact. Tucker v. Wyoming Coal Mining Co., 18 Wyo. 97, 104 P. 529, 530 (1909). Before trial, defense counsel knew that Bartlett had made incrimi-

nating statements about Lopez to Strauser. Those allegations had been investigated by the defense, and Lopez's potential culpability was explored at trial. After trial, defense counsel learned that Bartlett had made similar incriminating statements about Lopez to the Lessards. While evidence of the specific statements Bartlett made to the Lessards was newly discovered, inasmuch as the statements were not made until after trial, the evidence was merely cumulative to evidence of the similar statements Bartlett had made to Strauser. Furthermore, because Bartlett's statements were inherently so incredible, they were not so material that it probably would have produced a different result at trial.

## CONCLUSION

[¶ 41] The trial court did not abuse its discretion in denying the appellant's new trial motion or in concluding that defense counsel was not ineffective.

[¶ 42] We affirm.